[This opinion has been published in *Ohio Official Reports* at 80 Ohio St.3d 6.]

AKRON BAR ASSOCIATION *v.* MILLER ET AL.

[Cite as *Akron Bar Assn. v. Miller*, 1997-Ohio-364.]

*Attorneys at law—Individual and corporations not authorized to practice law in Ohio who give legal advice and counsel in marketing living trusts are engaged in the unauthorized practice of law.*

(No. 97-1023—Submitted July 7, 1997—Decided October 8, 1997.)

ON FINAL REPORT by the Board of Commissioners on the Unauthorized Practice of Law of the Supreme Court, No. UPL 95-3.

————————————

{¶ 1} On October 6, 1995, relator, Akron Bar Association, filed a complaint charging that respondents, David M. Miller and National Health & Life Associates, Inc. ("NHLA"), both of Akron, and Living Trusts America ("LTA") of California, were engaging in the unauthorized practice of law. Miller and NHLA answered, admitting that Miller was not licensed to practice law and denying that either Miller or NHLA was engaged in the unauthorized practice of law. Jack L. Pefley, doing business as LTA, answered, stating that LTA was a California company, had no connections with Miller or NHLA, and was not engaged in the unauthorized practice of law. Pefley claimed that Miller was an independent contractor.

{¶ 2} Based on evidence at a September 13, 1996 hearing, the Board of Commissioners on the Unauthorized Practice of Law of the Supreme Court ("board") found that in February 1991, LTA, through NHLA, recruited Miller as an LTA agent in Ohio. Miller then signed a "Marketing Agency Agreement" with LTA. LTA trained Miller to market living trusts by following a scripted sales presentation to living trust prospects, obtaining information from them, transmitting that information to LTA, and overseeing the execution of documents prepared by LTA. Miller was not an attorney, and although he "went through" with

his clients the information provided by LTA, some of which concerned probate avoidance, he personally did not understand what "avoiding probate" meant. Other parts of the "script" defined a living trust, described the tax effects of joint tenancy, and discussed the merits of guardianship.

{¶ 3} In May 1991, Miller made such a presentation to Esther J. Merkh, a seventy-eight-year-old woman, who had been a client of his for a year, advising her that he was an agent of LTA. Miller filled in the forms provided by LTA with information he received from Merkh. The forms to be completed required a designation of whether assets were "Probate or Non-Probate," and whether they were owned separately, jointly, or as community property. Merkh, relying on Miller for advice and the preparation of the final documents, then gave Miller a check payable to LTA for $695. Miller forwarded the completed forms and check to NHLA, which transmitted them to LTA in California. Miller, NHLA, and LTA each received a share of the $695.

{¶ 4} LTA prepared a pour-over will, a living trust, and a durable power of attorney for Merkh and forwarded them to Miller. The documents contained several inaccuracies: *e.g*., they were to be effective May 15, 1991, but were not executed until August 27, 1991. Also, the durable power of attorney had no provision for witnesses but contained the language "release and quitclaim to all my estate." Miller, who did not believe that it was his duty to see that the documents were correct, presented the documents to Merkh in August 1991, explained their legal effect, took Merkh to the bank, and received a check for an additional $150.

{¶ 5} Miller claimed that he was only gathering information for LTA, and not giving Merkh advice or creating documents in the trust package. Yet, the board found that in the process of completing the forms used to prepare the LTA documents, Miller gave Merkh legal advice and counsel because he aided Merkh in designating probate and non-probate assets, selecting a form of trust, designating various beneficiaries, and determining tax treatment. The board further found that

2

LTA exercised control over Miller by means of the documents whose execution he was to oversee and the script he was to follow.

{¶ 6} The board concluded that the actions of Miller, NHLA, and LTA constituted the unauthorized practice of law.

_____

*Frank E. Steel*, for relator.

*Mary L. Cibella*, for respondents David M. Miller and National Health & Life Associates, Inc.

_____

***Per Curiam.***

{¶ 7} In *Land Title Abstract & Trust Co. v. Dworken* (1934), 129 Ohio St. 23, 28, 1 O.O. 313, 315, 193 N.E. 650, 652, we held that the practice of law "'includes legal advice and counsel, and the preparation of legal instruments and contracts by which legal rights are secured * * *.'" In *Green v. Huntington Natl. Bank* (1965), 4 Ohio St.2d 78, 33 O.O.2d 442, 212 N.E.2d 585, we held that a bank's providing of "specific legal information in relation to the specific facts of a particular person's estate" constituted the practice of law and should be enjoined.

{¶ 8} In this case, Miller, on behalf of himself and NHLA, and following a script prepared by LTA, provided both counsel and document preparation. Miller informed Merkh about the advantages of a living trust and aided her in completing the forms that provided information to LTA for the preparation of a living trust and related documents.

{¶ 9} The sales-presentation script used by Miller consisted of a series of questions and answers designed to elicit positive responses from the client, resulting in agreement to a living trust. The script describes probate in negative terms, reviews the legal and tax effects of joint tenancy, and describes the living trust device in very positive terms. The script concludes with a series of questions to which the salesperson is directed to "get an agreement." At the conclusion of

these questions, the salesperson is to quote a $14,000 cost of probate for a hypothetical $300,000 estate, and then, without reference to the client's specific assets, ask the client whether she wants her estate to pay $14,000 in probate costs. The sales agent is then directed to ask with respect to such cost, "Is that why your family sacrificed and did without? *ans*. Of course not. I can see why you want a Living Trust." The script then comments, "[A]t this point, the sale has been made," and directs the salesperson to proceed to the worksheet.

{¶ 10} Completion of the worksheet form requires more than information gathering. It requires advice and counsel. For example, the third column on page one of the "Estate Planning Worksheet" requires that either the client or the salesperson determine which of the client's assets—cash on hand, real property, stocks and bonds, insurance, mutual funds, retirement benefits, etc.—are to be "Probate or Non-Probate." Pages two and three of the worksheet provide a menu of trust vehicles and wills for the client's selection, each with a short, bulleted description of its particular advantages. Page six of the worksheet requires the entry of information for a pour-over will. A three-line, twenty-two-word description of a pour-over will appears on page three of the worksheet.

{¶ 11} In view of the decisions which had to be made to complete the forms, decisions which involved a consideration of legal concepts, it is disingenuous for Miller to claim that he was not giving advice and counsel and to imply that, based upon Miller's short sales pitch, Merkh was sophisticated enough to be aware of her own estate-planning requirements. Miller was more than a servant doing Merkh's bidding.

{¶ 12} Moreover, Miller is mistaken when he claims that because LTA produced the documents he was not engaged in the practice of law. Miller and NHLA were agents of LTA. And because of their arrangements, he, as a salesperson, NHLA, his employer, and LTA worked in concert to produce the legal documents.

**{¶ 13}** Miller is not insulated from the unauthorized practice of law by the self-serving "Consumer Information and Disclosure" at the end of the worksheet signed by Merkh. That disclosure read in part, "No legal counsel, legal advice, or tax advice has been offered by the agent of Living Trusts America or Living Trusts America." Merkh may not have understood she was receiving legal advice, and Miller did not know that he was giving legal advice.

**{¶ 14}** We are also concerned because an individual who believed she was receiving counseling was receiving instead a "sales pitch." Miller's concern was to sell a product, an LTA living trust. LTA's concern was the marketing of documents creating living trusts, almost solely on the basis that such trusts avoided the costs of probate. Yet these costs were quoted at a figure totally unrelated to Merkh's circumstances. No one was concerned about objectively advising Merkh.

**{¶ 15}** Unlike a salesperson, the good lawyer's counsel is not directed to the sale of a product but to the best interests of the client. A lawyer's counseling is more than informing "his client about the legal consequences of pursuing a particular objective that the client has already identified and chosen. * * * [R]esponsibilities to a client go beyond the preliminary clarification of his goals and include helping him to make a deliberately wise choice among them." Kronman, The Lost Lawyer (1993) 128-129. As alternatively stated, "the lawyer's job is not merely to supply whatever means are needed to achieve the client's goals but also to deliberate with the client and on his behalf about these goals." *Id.* at 132. Importantly, the personal desires of the lawyer must be subordinated to those of the client. That is why our Code of Professional Responsibility has Ethical Considerations that state that legal advice is improper if motivated by a desire to obtain personal benefit.

**{¶ 16}** We adopt the findings and conclusions of the board that Miller, NHLA, and LTA all were engaged in the unauthorized practice of law. They are each hereby enjoined from any further activity involving the counseling of persons

with respect to their legal rights and the preparation of legal instruments and documents to secure the legal rights of any person.

{¶ 17} All costs and expenses of this action are taxed jointly and severally to respondents Miller, NHLA, and LTA.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

————————————