CLEVELAND BAR ASSOCIATION *v.* SHARP ESTATE SERVICES, INC. ET. AL.

[Cite as *Cleveland Bar Assn. v. Sharp Estate Serv., Inc.,* 107 Ohio St.3d 219, 2005-Ohio-6267.]

(No. 2004–2114—Submitted May 10, 2005—Decided December 14, 2005.)

---

PFEIFER, J.

{¶ 1} On July 5, 2002, relator, Cleveland Bar Association ("CBA"), filed an amended complaint with the Board on the Unauthorized Practice of Law pursuant to Rule VII of the Ohio Supreme Court's Rules for the Government of the Bar, asserting that respondents Sharp Estate Services, Inc., Asset Preservation Group, Inc., Sharp Estate & Insurance Services, Inc., Jeffrey G. Sharp, Robert Clapacs, and Diane C. Sharp (collectively, "Sharp"), Henry W. Abts III, and The Estate Plan ("TEP") engaged in the unauthorized practice of law in Ohio. The

complaint alleged that each respondent sold living-trust and estate plans and related documents to Ohio residents. After a hearing, the board recommended that this court hold that each respondent has engaged in the unauthorized practice of law in Ohio and that we enjoin each respondent from the further unauthorized practice of law. The board also included a statement of costs to be paid by respondents.

{¶ 2} TEP is a Nevada corporation owned by Abts that engages nationwide in the preparation and marketing of living trusts and other estate-planning products. TEP associates with companies and individuals, known as advisors, who market and sell its products. Advisors are typically nonattorneys; none of the respondents in this case are licensed to practice law in Ohio. Advisors are under contract with TEP, are required to attend TEP training sessions, and must adhere to a sales and marketing manual that instructs them how best to market TEP products.

{¶ 3} A typical transaction begins with advisors developing prospects through telemarketing or purchased lists, followed by a sales presentation in the prospective customer's home. When Sharp advisors make sales presentations, they use TEP products to assist the prospective customer in determining what type of living trust or estate plan is appropriate. Many customers were targeted despite clear indications that they would not benefit from a living trust or estate plan. Advisors routinely provide TEP folders containing information on living trusts or estates to prospective customers. The board concluded that Sharp was under contract with TEP, that Sharp used TEP products extensively, and that TEP and Abts permitted the Sharp advisors to hold themselves out as representatives of TEP.

{¶ 4} When a prospect agreed to purchase a TEP living trust or estate plan, the Sharp advisor procured a signed purchase agreement from the customer and two checks. One check was payable to the advisor; the other was payable to the review attorney, who had been selected by the advisor from a list provided by TEP. The review attorney, who is typically under contract with TEP, would enter the customer's information into a TEP computer-software program, usually without having had contact with the customer. TEP would then prepare the requested documents and return them directly to the advisor, who would deliver the documents to the customer.

{¶ 5} Sharp's fees range from $1,995 and $2,195 for living-trust and estate-planning documentation for modest estates. Fees for estates involving millions of dollars were more expensive, ranging upward from about $2,495. According to the partial list provided by TEP, at least 468 living-trust and estate plans were sold in Ohio.

{¶ 6} The board concluded that Sharp's nonattorney advisors engaged in the unauthorized practice of law when they told customers that they needed a living trust or estate plan, when they recommended specific types of trust or estate plans, and when they advised customers of the legal consequences of their choices. The board found that TEP and Abts engaged in the unauthorized practice of law when they marketed and sold their products through a network of nonattorney advisors, when they prepared legal documents, and when they advised customers as to the legal effect of the documents that they had prepared. The board also found that the use of a review attorney after the execution of a contract to create a living trust or estate plan does not cure the unauthorized-practice-of-law ("UPL") violation. This conclusion was bolstered by the fact that the purchase agreements between TEP and its customers do not require attorney approval.

{¶ 7} The board recommended that Sharp and TEP be enjoined from further engaging in the unauthorized practice of law and that Sharp and TEP pay the costs incurred by the board and the CBA. We agree with the recommendations of the board and impose further sanctions as discussed below.

{¶ 8} The unauthorized practice of law is defined as "the rendering of legal services for another person by any person not admitted to practice in Ohio." Gov.Bar R. VII(2)(A). The record reflects that none of the respondents are admitted to the practice of law in Ohio. Nevertheless, they marketed and sold living trusts and estate plans, explained the legal consequences of specific decisions relating to living trusts or estate plans, and prepared legal documents related to living trusts or estate plans. These activities constitute the unauthorized practice of law. See *Cincinnati Bar Assn. v. Kathman* (2001), 92 Ohio St.3d 92, 96, 748 N.E.2d 1091.

{¶ 9} Respondents argue that the use of review attorneys to supervise the estate or trust-document preparation immunizes them from a UPL charge. The evidence reveals, however, that review attorneys were only tangentially involved in the transactions. In most cases, they did nothing more than enter a customer's information into a TEP computer program, and they rarely came into contact with customers. Further, approval by the review attorney was not required by the purchase agreement.

{¶ 10} Even if the attorneys had been extensively involved in the transaction, they were incapable of acting solely in the interests of their ostensible clients because of their contractual relationship with TEP: review attorneys are subject to termination by TEP if they prepare non-TEP living-trust or estate-plan documents based on information received from an advisor. In *Kathman*, we concluded that "the review attorney enters the relationship too late," and we followed the analysis of the Colorado Supreme Court, which concluded that "hub"

attorneys merely "lend[ ] credibility and a façade of legality to the product the nonattorney offers." Id. at 97, 748 N.E.2d 1091, citing *People v. Cassidy* (Colo.1994), 884 P.2d 309, 311. Because the advisor, not the attorney, sells the trust or estate plan and makes the decisions necessary to create the trust or estate document, the use of hub attorneys does not cure the UPL violation.

{¶ 11} In *Kathman*, we also found that an attorney who assists a nonattorney in the marketing and selling of living trusts violates DR 3–101(A), which prohibits such assistance. Id. at 96, 748 N.E.2d 1091. Consequently the hub attorneys involved with respondents knew that they themselves were violating DR 3–101(A).

{¶ 12} Respondents TEP and Abts argue that Sharp and his associates were not their agents and that TEP had disclaimed any agency relationship in the contracts between TEP and Sharp. The record, however, reflects that Sharp was under contract with TEP, that TEP and Abts permitted the Sharp advisors to hold themselves out as agents of TEP, and that the Sharp advisors received extensive training from TEP on marketing and selling trust and estate plans to customers. We conclude that there was an agency relationship between TEP and Sharp.

{¶ 13} The board recommended that an injunction be issued enjoining the respondents from the unauthorized practice of law in Ohio. Given the gravity of the respondents' UPL violations, we conclude that a permanent injunction preventing the respondents from marketing and selling living trusts in Ohio is appropriate. Otherwise, respondents could make minor changes to their operation and continue marketing and selling trusts and estates in Ohio. This decision is in line with similar UPL cases. See *Trumbull Cty. Bar Assn. v. Hanna* (1997), 80 Ohio St.3d 58, 61, 684 N.E.2d 329.

{¶ 14} We further order respondents to comply with the board's order to disclose the names of their Ohio customers. Within seven days following the issuance of the court's order, the respondents will disclose to the board, with a copy to the Cleveland Bar Association, the names and addresses of all of their Ohio clients. Beginning on the eighth day after the order, a fine of $25,000 per day will be imposed until all Ohio clients have been disclosed. The Cleveland Bar Association will send a letter to each of the Ohio clients informing them of the UPL conduct of the respondents and suggesting that the clients may want to consult with a lawyer of their choice, at their expense, to confirm that the respondents' documents are suitable and appropriate for them. Respondents shall be responsible for attorney fees and costs incurred by the relator as recommended by the board.

{¶ 15} Finally, we determine that it is appropriate to impose monetary penalties on the respondents under Gov.Bar R. VII(8)(B). The rule allows the

board to recommend and the court to impose civil penalties in an amount up to $10,000 per offense. Id. The factors to be considered include the degree of cooperation provided by the respondents in the investigation, the number of UPL violations, the flagrancy of the violations, harm to third parties arising from the violations, and any other relevant factors. Id. We conclude that each of these factors weighs heavily against the respondents. First, as the record shows, the respondents have failed to fully cooperate in the investigation, and they have ignored the board's order to disclose lists of their Ohio customers. Second, the respondents committed hundreds of UPL violations. Third, the respondents' violations were flagrant because they aggressively targeted customers even after *Kathman*, 92 Ohio St.3d 92, 748 N.E.2d 1091, which warned that trust-mill operations are UPL violations. Finally, the respondents' offenses harmed third parties, their ostensible clients. As we stated in *Kathman*, "The principal reason courts have restricted the rendering of legal services to licensed attorneys is for the protection of the public." Id. at 97, 748 N.E.2d 1091. In short, the respondents have willfully defrauded their customers by selling trusts and estate documents without authorization.

{¶ 16} Contrary to the respondents' argument, the imposition of monetary penalties is constitutional even though the case was filed before the amendment of former Gov.Bar R. VII(8), 99 Ohio St.3d XCIII, XCIV, which specifically allowed for monetary penalties. Nothing in the Ohio Constitution prohibited this court from imposing monetary penalties prior to adoption of former Gov.Bar R. VII(8)(D). See Section 2(B)(1)(g), Article IV, Ohio Constitution. We have previously imposed monetary penalties in a UPL case in which some of the violations predated former Gov.Bar R. VII(8)(D). *Toledo Bar Assn. v. Chelsea Title Agency of Dayton, Inc.*, 100 Ohio St.3d 356, 2003-Ohio-6453, 800 N.E.2d 29. Furthermore, Gov.Bar R. VII "shall be liberally construed for the protection of the public, the courts, and the legal profession and shall apply to all pending investigations and complaints so far as may be practicable, and to all future investigations and complaints whether the conduct involved occurred prior or subsequent to the enactment or amendment of this rule." Gov.Bar R. VII(17). The imposition of monetary sanctions is not prohibited.

{¶ 17} For the foregoing reasons, we affirm the decision of the Board on the Unauthorized Practice of Law. We impose a civil penalty in the amount of $1,027,260, determined by multiplying 468, the number of living-trust and estate plans sold by Sharp in Ohio, by $2,195, against all respondents on a joint and several basis. Costs are taxed to respondents.

Judgment accordingly.

Moyer, C.J., Resnick, Lundberg Stratton, O'Connor, O'Donnell and Lanzinger, JJ., concur.

Buckley King L.P.A. and John A. Hallbauer; Jones Day, David A. Kutik, and John D. Fabian, for relator.

Tucker Ellis & West L.L.P., Matthew P. Moriarty, and Jeffrey M. Whitesell, for respondents The Estate Plan and Henry W. Abts III.