[Cite as *Columbus Bar Assn. v. Am. Family Prepaid Legal Corp.*, 123 Ohio St.3d 353, 2009-Ohio-5336.]

COLUMBUS BAR ASSOCIATION *v.* AMERICAN FAMILY PREPAID LEGAL

CORPORATION ET AL.

[Cite as *Columbus Bar Assn. v. Am. Family Prepaid Legal Corp.*,

123 Ohio St.3d 353, 2009-Ohio-5336.]

*Unauthorized practice of law — Preparation of and advice relative to trust and*
*estate-planning documents — Practice enjoined — Civil penalties*
*imposed.*

(No. 2005-0422 — Submitted January 13, 2009 — Decided October 14, 2009.)

ON FINAL REPORT by the Board on the Unauthorized Practice of Law of the

Supreme Court, Nos. UPL 02-10 and UPL 05-02.

_____

**Per Curiam**.

{¶ 1}   This case comes to us on three separate reports from the Board on
the Unauthorized Practice of Law, and our opinion is accordingly divided into
three parts.  Part One addresses contested findings of fact, conclusions of law, and
recommendations against two corporate and multiple individual respondents.
Parts Two and Three approve consent decrees proposed by relator and four other
individual respondents.

### Part One

{¶ 2}   In this case, we consider yet again the propriety of enterprises in
which persons unlicensed to practice law in this state target and solicit Ohioans,
mainly the elderly, to purchase documents to form a living trust and other estate-
planning tools.  A living-trust package is often not needed and may even be
harmful for persons who are without significant assets, who have simple estates,
or whose estates may need court supervision.  A basic living-trust package, such
as those sold by some of the respondents, may likewise be insufficient or even

completely inappropriate for those having more substantial assets and who may need specific legal advice or even tax advice to meet their needs.

{¶ 3} For this reason, we have repeatedly held that these enterprises, in which the laypersons associate with licensed practitioners in various minimally distinguishable ways as a means to superficially legitimize sales of living-trust packages, are engaged in the unauthorized practice of law. We have also repeatedly held that by facilitating such sales, licensed lawyers violate professional standards of competence and ethics, including the prohibition against aiding others in the unauthorized practice of law. Today, we reaffirm these holdings and admonish those tempted to profit by such schemes that these enterprises are unacceptable in any configuration.

{¶ 4} In 2002, relator, Columbus Bar Association ("CBA"), charged that respondents, American Family Prepaid Legal Corporation ("American Family"), Heritage Marketing and Insurance Services, Inc. ("Heritage"), and their co-owners, managers, and named agents, had violated Ohio licensure requirements by promoting and selling instruments through which legal rights are established and memorialized, including living trusts. In March 2003, the parties entered into a consent agreement in which all respondents agreed to refrain from specified acts that they agreed were the unauthorized practice of law. Respondents also agreed to the CBA's enforcement of the consent agreement through proceedings before the Board on the Unauthorized Practice of Law and this court.

{¶ 5} After protracted proceedings, the board now recommends that we find respondents in breach of the consent agreement for continuing to engage in the practices constituting the unauthorized practice of law. The board also recommends that we grant an injunction prohibiting respondents' unlawful activity and assess $700,000 in civil penalties against American Family, Heritage, and their co-owner principals. Finally, the board recommends that we assess a

$10,000 civil penalty against American Family's state marketing director and a $7,500 civil penalty against American Family's office manager.

{¶ 6} Over objections by some respondents to the board's findings of fact and conclusions of law, we confirm the determinations as to the illegal acts of these respondents. We further sustain the CBA's objections to the board's recommended sanction by (1) fortifying the terms of the injunction, (2) assessing a $6,387,990 civil penalty, jointly and severally, against American Family, Heritage, and Jeffrey Norman and Stanley Norman, their co-owner principals, (3) assessing a $10,000 civil penalty against Paul Chiles, American Family's state marketing director, (4) assessing a $7,500 civil penalty against Harold Miller, American Family's office manager, and (5) assessing a $2,500 civil penalty against various American Family and Heritage agents who continued to engage in the unauthorized practice of law after signing the consent agreement.

## I. The Parties and Case Background

### A. The Parties

{¶ 7} At all times relevant to these proceedings, American Family was a California-based corporation with offices in Ohio. During some of the period at issue, American Family was registered with this court under former DR 2-103(D)(4)(g) (now Gov.Bar R. XVI(5)) as a "bona fide organization that recommends, furnishes, or pays for legal services to its members or beneficiaries," a requirement that extended to "qualified legal assistance organizations providing prepaid legal services." See former EC 2-32.[1] Heritage, another California-based corporation, sold annuities and other insurance products to customers of American Family.

{¶ 8} Respondent Jeffrey Norman, then American Family's chief executive officer and Heritage's president, and respondent Stanley Norman, then

---

1. American Family is no longer registered with the court as a provider of prepaid legal-services plans.

American Family's president and Heritage's chief executive officer, each owned a 50 percent share in both American Family and Heritage, and both worked out of the same office space. At all relevant times, respondent Harold Miller served as American Family's office manager, and respondent Paul Chiles served as American Family's state marketing director, overseeing both American Family and Heritage agents.

{¶ 9} American Family, Heritage, the Normans, Miller, and Chiles were not authorized to practice law in Ohio before or after the March 2003 consent agreement. American Family, Heritage, and Jeffrey Norman have jointly objected to the board's report.

{¶ 10} Of the remaining respondents, Tim Clouse, Eric Peterson, Luther Mack Gordon, Chris Miller, Patty Soos, Anthony Sullivan, Jeff Alten, William Downs, Steve Grote, Jack Riblett, Ken Royer, Dennis Quilan, Alexander Scholp, Jerrold Smith, and Joseph Ehlinger conducted business during the relevant period as agents of American Family. Joseph W. Hamel, Tim Holmes, Paul Morrison, David Helbert, Richard Rompala, and Adam Hyers conducted business as Heritage agents.[2] These respondents were, likewise, not authorized to practice law in Ohio before or after the March 2003 consent agreement. We distinguish these respondents from respondents Samuel Jackson and Vern Schmid, as we have been unable to find evidence establishing that they participated during the relevant time period in the unauthorized practice of law in violation of the consent agreement. Jackson and Schmid are accordingly dismissed as parties to this proceeding. Respondents Peterson, Downs, Grote, and Scholp have filed objections to the board's report.

*B. Case Background*

---

2. The board treated the allegations against respondents Clouse, Hamel, Holmes, and Hyers separately upon the filing pursuant to Gov.Bar R. VII(5b) of proposed consent decrees. We address these matters in Parts Two and Three.

{¶ 11} On March 3, 2005, CBA sought an order from this court enforcing the parties' consent agreement, claiming that respondents had continued to engage in the unauthorized practice of law in violation of that agreement. The consent agreement, executed by all respondents, listed the following prohibited acts that the parties acknowledged would constitute the unauthorized practice of law if performed by respondents: "(1) selling, marketing, and/or preparing wills, living trusts, durable powers of attorney, deed transfers, and agreements for transfer or assignment of personal property (referred to collectively herein as 'legal products'); (2) training, monitoring and educating other sales representatives to sell, market or prepare said legal products; (3) giving legal advice relative to said legal products; (4) advising and counseling clients concerning the suitability of said legal products for a client's particular situation; (5) gathering client information for purposes of preparing or determining the suitability for the appropriate legal products for a client's particular situation without acting under the direct supervision and control of the client's attorney; (6) preparing said legal products for a client particular to the client's situation without acting under the express direction and control of the client's attorney; (7) offering legal advice to individuals concerning the execution of said legal products; and (8) engaging the services of an Ohio attorney to conduct only cursory reviews of said legal products with little or no contact with clients."

{¶ 12} CBA also moved this court for an interim cease-and-desist order pursuant to former Gov.Bar R. VII(5a)(A)(1), citing substantial, credible evidence that respondents had engaged in the unauthorized practice of law and posed a substantial threat of harm to the public. We granted the motion and, under former Gov.Bar R. VII(5a)(B),[3] ordered respondents to immediately cease and desist

---

3. {¶ a} Former Gov.Bar R. VII(5a)(B) provided:

{¶ b} "Upon consideration of the motion and any memorandum opposing the motion the Supreme Court may enter an order that the respondent cease and desist engaging in the

from illegal practices. We also ordered the board to hold a hearing to determine "whether the March 2003 settlement agreement ha[d] been violated and to file a report with the Court." *Columbus Bar Assn. v. Am. Family Prepaid Legal Corp.*, 105 Ohio St.3d 1493, 2005-Ohio-1702, 825 N.E.2d 618.

{¶ 13} A panel of appointed board members considered the case on the parties' cross-motions for summary judgment. The panel recommended summary judgment in favor of one respondent agent, Daniel Roundtree, and in favor of the CBA on all other motions, concluding that all respondents other than Roundtree had violated the consent agreement as well as Ohio licensure requirements governing the practice of law. The panel recommended injunctive relief and the civil penalties in the amounts of $700,000, $10,000, and $7,500. The board adopted the panel's findings and recommendation in full.[4]

## II. Violations of the Consent Agreement

{¶ 14} Summary judgment may be granted when properly submitted evidence, construed in favor of the nonmoving party, shows that the material facts in the case are not in dispute and that the moving party is entitled to judgment as a matter of law because reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Todd Dev. Co., Inc. v. Morgan*,

---

unauthorized practice of law, pending final disposition of proceedings before the Board predicated on the conduct threatening the serious harm or may order other action as the Court considers appropriate. If requested by relator, the Supreme Court may enter an order that the respondent immediately cease and desist engaging in the unauthorized practice of law prior to receipt of a memorandum opposing the relator's motion, pursuant to Rule XIV of the Rules of Practice of the Supreme Court of Ohio." 103 Ohio St.3d CIII–CIV.

{¶ c} American Family challenged the provisions of Gov.Bar R. VII(5a) authorizing an interim cease-and-desist order in federal court, alleging that the rule on its face failed to provide a sufficient pre- or postdeprivation hearing to protect American's liberty and property interests and thereby violated the Due Process Clause of the United States Constitution. In *Am. Family Prepaid Legal Corp. v. Columbus Bar Assn.* (C.A.6, 2007), 498 F.3d 328, the Court of Appeals for the Sixth Circuit affirmed the district court's decision to invoke the *Younger* abstention doctrine, see *Younger v. Harris* (1971), 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669, and to dismiss that action.

4. The board granted summary judgment in Roundtree's favor because he ended any association with American Family or Heritage within days after signing the consent agreement. Roundtree is accordingly dismissed as a party to this proceeding.

116 Ohio St.3d 461, 2008-Ohio-87, 880 N.E.2d 88, ¶ 11. CBA has satisfied this standard.

*A. American Family and Heritage Business Practices from*
*March 2003 until March 2005*

{¶ 15} American Family, its owners, employees, and agents conducted business from March 2003 until March 2005 by selling memberships in what the corporate respondents argue was a prepaid legal-services plan, and for several of the years at issue, American Family was registered as such with this court. Nevertheless, American Family's purported mission — to provide a variety of legal assistance to members at a discounted price from an assortment of affiliated lawyers — was not as promised. Instead, the legal assistance that American Family provided for the cost of its plan nearly all related to one service — avoiding estate probate costs through the creation of a living trust.

{¶ 16} American Family targeted older Ohioans by purchasing lead lists identifying customers over the age of 65. American Family then paid other marketing firms to send advertising mailers to thousands of these older Ohio residents and placed similar advertisements in magazines.

{¶ 17} The mailers encouraged customers to fill out and return preaddressed postcards to obtain information about trusts and estates and a free publication entitled "The Peoples [sic] Right to Know." One example of American Family's overreaching advertisements claimed:

{¶ 18} "AARP[5] STUDY: FINDINGS ON PROBATE, ESTATE SETTLEMENT AND TAX SAVINGS

{¶ 19} "In a recent **AARP study**, it was revealed that the American Public pays **$1.5 BILLION DOLLARS each year in legal fees** due to an **outdated**

---

5. AARP sued American Family in North Carolina over this mailer. Complaint, *AARP v. Am. Family Prepaid Legal Corp., Inc.*, No. 06 CVS 10216 (N.C.Super.Ct., Sept. 14, 2006), 2006 WL 3243890.

**probate and settlement process** and under-informed customers. Depending on the value of your estate **probate, settlement costs and estate taxes** may be a **heavy burden** for your heirs to pay.

{¶ 20} "Accordingly, wills may not reduce costs or provide any assistance to your heirs for settling your estate. Your heirs may be trapped in a probate and estate settlement process where **fees alone can deplete an estate by as much as 10%**. **PROTECT YOUR SAVINGS!** *You have a right to know more about this and how it can affect you.*" (Emphasis sic.)

{¶ 21} American Family mailers did not mention any comprehensive legal-services plan. The mailers also did not provide American Family's name or any contact information or advise that sales calls would follow the return of postcards. Moreover, some customers claim that they never mailed a response card but received a "cold call" from American Family.

{¶ 22} After receiving information provided on returned postcards, telemarketers called the prospective customers to schedule appointments and dispatched American Family sales agents to the customers' homes. In arranging these appointments, American Family telemarketers did not refer to a prepaid legal plan and did not inform the customer that he or she would be solicited to buy a prepaid legal plan or living trust. The telemarketers did ask, however, whether the prospect already had a living trust.

{¶ 23} In sales presentations, usually occurring in a customer's home, American Family's agents focused on convincing a customer that he or she needed a living trust. If sold, the customer paid a $1,995 fee purportedly for an array of legal services relative to landlord/tenant law, businesses, domestic relations, bankruptcy, and other legal fields, at discounted fees, from a number of listed Ohio attorneys. Almost exclusively, however, the only legal service that the plan members received was the preparation of a living-trust document and related estate-planning instruments such as powers of attorney and a living will.

For this reason, for the thousands of memberships sold, few if any members obtained legal assistance other than a living-trust portfolio.

{¶ 24} To secure these sales, the agents used aggressive tactics during their in-home presentations. They took advantage of the customer's lifestyle and advanced age. They used a presentation booklet that misrepresented facts and deceptively exaggerated the disadvantages of the probate process to frighten the senior customers into purchasing living-trust plans. Among other things, the booklet overstated the need for and cost of attorney assistance in the probate process, the amount of attorney fees likely to be incurred in probate, the length of the probate process, the amount of control the court has over what and how much of the estate the named beneficiaries will receive, the perils of incapacity, the availability of legal assistance from American Family's "plan attorneys," and the benefits provided by American Family's living-trust product.

{¶ 25} The training materials American Family used to train its sales agents encouraged high-pressure, deceptive sales tactics. The training materials instructed the salesperson on how to set the stage for his or her sales pitch and on how to deflect customer objections to the sales pitch. For instance, the training guides have a section titled "Always Sit at the Kitchen Table." The manuals refer to the settlement of estates as a "colossal task." The manuals even provide specific instructions on how to discourage senior customers from consulting with attorneys or their children before making a purchase.

B. *Legal Advice Given by American Family Sales Representatives*

{¶ 26} During the in-home presentation, the salesperson obtained detailed personal and financial information from the customer, including contact and identity information, family and beneficiary information, real estate ownership and values, and other assets and values, which they entered on forms entitled "Information Questionnaire" and "Estate Planning Worksheet." The sales agent used this information, among other purposes, to "estimate" the amount of probate

costs a particular customer would have to pay if he or she did not have a living trust and to compare that figure to the costs associated with a living trust that customers were told would enable them to avoid such costs. These costs and fees were routinely inaccurate and overstated; they almost always exceeded the $1,995 cost of purchasing a living trust from American Family. Indeed, American Family trains its sales agents to present their "T-Close" drawing to show typical probate and estate settlement costs to be $9,800.

{¶ 27} American Family's 2005 sales training manual advised sales agents to tell customers that they are not lawyers or accountants when they introduce themselves to customers. Nevertheless, the sales agents generally gave a detailed, and in some respects incorrect, explanation of the probate process, discussed alternatives to the probate process, and advised the particular customer that he or she would benefit from purchasing a living trust through American Family. Regularly, the sales agents represented that a living trust was necessary to give effect to the customers' wishes or provide for their beneficiaries. This element of the sales pitch sometimes involved statements that a customer's existing estate documents would not effectively provide for the beneficiaries. Thus, American Family's sales agents promoted the living trust as the best approach to estate planning without regard to the individual's particular situation. The sales agents received a commission of $750 per sale of a plan membership.

{¶ 28} The sales agent then obtained the customer's signature on a document entitled "Fee and Engagement Agreement" and completed a name-spelling checklist and a questionnaire detailing the customer's assets for preparation of the trust documents. The sales agent typically had no further contact with the plan member after the sale. No attorney had yet reviewed the customer's information to determine the wisdom of creating a living trust.

{¶ 29} Some examples contained in the files obtained by the CBA demonstrate the flagrancy of American Family's disregard for its customers' needs:

{¶ 30} ● Plan members EHM and MAM, age 84 and 81, residents of Shaker Heights, bought a living-trust package from respondent Jeffrey Alten. Alten remarked that MAM had Alzheimer's disease but was able to sign the sales documents anyway.

{¶ 31} ● DMF of Struthers was 77 when respondent Patty Soos sold her a trust package even though DMF's estimated gross assets totaled $127,000.

{¶ 32} ● DMA of Miamisburg was 78 when respondent Alexander Scholp sold him a trust package. Scholp told DMA that he needed to avoid probate and attorney fees that would otherwise be incurred to administer his estate, which totaled $64,200 in gross assets, including his mobile home.

{¶ 33} ● RSH of Cincinnati was 88 years old when respondent Steve Grote sold her a trust package. Grote put a medical rush on the delivery of the trust documents because of RSH's condition. According to Hamilton County Probate Court records, RSH died less than four months after the sale.

{¶ 34} ● JRS of Georgetown was 70 years old when respondent William Downs sold him and his wife a trust. At the time, JRS and his wife had gross assets of about $112,000, and they paid for the trust by credit card. Downs put a rush on the delivery of the trust documents because JRS's wife was receiving hospice care and was not expected to live much longer.

{¶ 35} The respondent sales agents made the following sales between approximately March 2003 and May 2005:

{¶ 36} ● Eric Peterson sold at least 124 plans to Ohioans with an average age of 75.5 years at the time of the sale. Peterson sold a plan to WES of Vermilion, even though WES's children explained that he was showing signs of Alzheimer's disease and even though WES had estimated gross assets of

11

$162,600, including real estate valued at $130,000. Peterson noted, "They are possibly interested in an irrevocable trust to start covering a look-back period."

{¶ 37} ● Luther Mack Gordon sold at least 180 plans to Ohioans with an average age of 76.4 years at the time of the sale. Gordon sold MEJ of Dayton, age 88, a trust package even though Gordon estimated her gross assets at $105,000, including her house valued at $100,000. She had only $2,000 in her bank accounts, so she paid for her trust with a credit card. Respondent Gordon also noted "medical emergency" on the estate-planning worksheet.

{¶ 38} ● Chris Miller sold at least 98 plans to Ohioans with an average age of 75.6 years at the time of the sale. Miller sold JJP and MJP of Columbus a trust package even though they had combined estimated assets of less than $120,000.

{¶ 39} ● Patty Soos sold at least 118 plans to Ohioans with an average age of 76.7 years at the time of the sale. Soos sold JB and JAB of Leetonia a trust package even though their house accounted for more than half of their $145,000 in estimated gross assets. At the time of the sale, Soos noted, "Husband has cancer and has refused chemotherapy. Please expedite the trust."

{¶ 40} ● Anthony Sullivan sold at least four plans to Ohioans with an average age of 83.8 years at the time of the sale. Sullivan sold a plan to HYI of Jamestown, age 90, even though Sullivan estimated her gross assets at $110,000, including her $90,000 house and a $10,000 annuity.

{¶ 41} ● Jeff Alten sold at least 55 plans to Ohioans with an average age of 77.3 at the time of the sale.

{¶ 42} ● William Downs sold at least 203 plans to Ohioans with an average age of 74.7 at the time of sale. Downs sold a plan to EG of Chillicothe, age 87. At the time, EG's estimated gross assets totaled $38,000, including a mobile home worth $33,000.

**{¶ 43}** ● Steve Grote sold at least 202 plans to Ohioans with an average age of 76.8. Grote sold a plan to NMH of Cleves, age 81, even though she did not have enough money in her bank accounts for the purchase. NMH, a widow, paid $1,995 by credit card, since she had approximately $500 in assets, not including her house.

**{¶ 44}** ● Jack Riblett sold at least 92 plans to Ohioans with an average age of 73.6 at the time of the sale. Riblett sold a plan to DBL of Columbus, age 88, even though she had only $6,000 in the bank and $50,000 in investments.

**{¶ 45}** ● Ken Royer sold at least 193 plans to Ohioans with an average age of 75.3 at the time of the sale. Several of the sales by Royer concerned what he described as "small estates"; however, he convinced Ohio plan members to purchase the estate plans as a way to avoid probate. Royer sold a trust to GLS of Dalton. GLS, a widow, had estimated gross assets of $55,000, including her $50,000 mobile home. Royer noted on the agreement, "Client realizes she has small estate; however, she still wants the estate plan * * *." GLS signed below a note written by Royer stating, "Want estate plan (trust included) in order to avoid probate and maintain estate privacy!"

**{¶ 46}** ● Joseph Ehlinger sold at least 76 plans to Ohioans with an average age of 75.7 at the time of the sale. Ehlinger sold a plan to MLP of Toledo, age 81. MLP had an estimated $50 to $500 in her bank, so she paid for the trust plan by credit card. Her only remaining asset was her house with an estimated value of $60,000.

**{¶ 47}** ● Dennis Quinlan sold at least 83 plans to Ohioans with an average age of 75.2 years at the time of the sale.

**{¶ 48}** ● Alexander Scholp sold at least 164 plans to Ohioans with an average age of 75.2 years at the time of the sale.

**{¶ 49}** ● Jerrold Smith sold at least 68 plans to Ohioans with an average age at sale of 76.4 at the time of the sale.

**{¶ 50}** The respondent delivery agents made the following deliveries between March 2003 and May 2005:

**{¶ 51}** ● Paul Morrison delivered TH's and BH's trust documents; they did not speak with and did not receive any legal advice from the plan attorney, Edward P. Brueggeman. Morrison gave what BH described as a "slick, high-pressure sales pitch urging [them] to buy an annuity or other insurance products." After several visits, Morrison persuaded TH and BH to transfer more than $107,000 in assets into an annuity that Morrison sold them. An attorney later informed BH that she did not need a living trust and advised her of the high penalties associated with an early withdrawal of money from her annuity. Morrison delivered to or reviewed with Ohio plan members at least 30 trust packages from March 2003 to March 2005.

**{¶ 52}** ● Richard Rompala delivered to or reviewed with Ohio plan members at least 17 trust packages from March 2003 to March 2005.

**{¶ 53}** ● David Helbert delivered to or reviewed with Ohio plan members at least 31 trust packages from March 2003 to March 2005.

### C. The Former Plan Attorney's Role in the Trust-Sale Scheme

**{¶ 54}** After their sales pitches, American Family sales agents sent the personal and financial information gathered about plan members to American Family's Ohio plan attorney, who for the periods of time in question was Brueggeman. From the start of his employment until March 2005, Brueggeman had an office within American Family/Heritage offices on Citygate Drive in Columbus. Brueggeman did not pay rent and used the supplies and services provided by American Family and Heritage employees to perform his role. Brueggeman did not hire or supervise the American Family sales agents.

**{¶ 55}** Brueggeman, after receiving the agreement, sent a form letter to the purchasers of the plan thanking them for choosing him to prepare their living trusts and their estate-planning documents. The letter also stated that the drafting

process would take four to six weeks and invited the customer to call him with questions.

{¶ 56} Occasionally, Brueggeman telephoned the customer to introduce himself or to confirm information on the paperwork provided by the American Family sales agent. These occasions were usually the only contact Brueggeman had with the customer. Brueggeman rarely, if ever, actually met an American Family plan member in person.

{¶ 57} Brueggeman or office staff sent the information gathered by American Family's sales agents to American Family's California office. American Family's California employees generated each plan member's living-trust documents with computer software designed for this purpose. Brueggeman did not hire these American Family employees and did not control or supervise the California employees. After the California employees incorporated the client information into the living-trust form documents using computer software designed for the task, the California employees packaged the completed documents and returned them to the Columbus office for delivery to the customers. Brueggeman cursorily reviewed the documents.

{¶ 58} From the start of his employment until approximately March 2005, American Family paid Brueggeman $120 per estate plan. From March 2005 until the end of his employment, American Family paid Brueggeman $375 for each completed estate plan.

*D. Legal Advice Provided and Sales of Annuities by Heritage Delivery Agents*

{¶ 59} After the Ohio office received the completed estate-planning documents, American Family forwarded them to Heritage, which operated from the same office, to be delivered to the plan members and to oversee their signing and witnessing. Brueggeman had a contract with Heritage for Heritage to provide this service. Brueggeman did not hire the Heritage agents and had no agreement with any individual delivery agent.

{¶ 60} The Heritage delivery agents, some of whom are individual respondents in this case, took the estate-planning documents to customers' homes under the ruse of reviewing the documents with the plan members and having them signed, witnessed, and notarized. The Heritage delivery agents also advised Ohio plan members how to fund their trusts. In this way, the Heritage delivery agents provided legal advice about deed transfers and other property transfers.

{¶ 61} The Heritage agents were insurance agents licensed to sell annuities and other insurance services. Nevertheless, their business cards identified each as an "Asset Preservation Specialist" without mentioning that they were licensed insurance agents. The Heritage agents possessed financial information about customers' assets, and they used this information to facilitate the main purpose of their visit — to sell insurance services such as equity-indexed, deferred annuities to the plan members.

{¶ 62} Neither Brueggeman nor Heritage paid the agents to deliver and notarize the documents. Instead, the Heritage agents received only commissions from the sale of annuities and other insurance products they sold to the American Family plan members.

{¶ 63} To emphasize this fact, Heritage's written training materials stated, "Delivery agents will be focusing on the delivery of documents, client service, and the sale of the company's annuity policies." Heritage trained its agents to sell annuities to elderly customers regardless of the individual customer's particular financial situation. Although Heritage's agent-training materials include a comment (buried at page 52 of the manual) on suitability of insurance products, the manual is replete with instructions about high-pressure sales, averting customer objections, and convincing the customer to purchase particular, high-commission annuities. According to the manual, a "*key element* to the success of [Heritage's] approach" is to conceal the nature of the product being sold until the very end. (Emphasis sic.) Heritage's training manual also repeatedly instructs the

agents to "assume the sale." Like American Family's training manuals, Heritage's manuals contained the same options for processing customer objections.

{¶ 64} In many cases, the elderly customer who purchased an annuity would not live long enough to be able to withdraw more than a limited amount of principal without being subject to a significant penalty, which the agents failed to explain to the plan members. Heritage agents promised high returns on investment to entice customers to purchase annuities. Complaints have been filed with the Ohio Department of Insurance by or on behalf of Ohioans who purchased annuities from Heritage. Many of these complaints concern the suitability of the annuity, given the age of the annuitant and the annuity terms.

*E. Heritage Agents Return to Sell Victims More Products*

{¶ 65} Other Heritage agents conducted annual reviews of the American Family plan members' portfolio. These agents received commissions for annuities and other insurance products they sold to the plan members.

*F. Analysis*

{¶ 66} In *Trumbull Cty. Bar Assn. v. Hanna* (1997), 80 Ohio St.3d 58, 684 N.E.2d 329, we admonished that without the requisite qualifications, training, and commitment to ethical standards required of lawyers licensed to practice in Ohio, laypersons may not advise clients about specific estate-planning tools, arrange for the preparation of the legal documents to implement the estate plan, and supervise the signing of the documents. This, we held, was the practice of law, and an unlicensed person engaged in the unauthorized practice of law by performing these activities. We enjoined the unlicensed person from engaging further in these activities.

{¶ 67} Four years later, in *Cincinnati Bar Assn. v. Kathman* (2001), 92 Ohio St.3d 92, 748 N.E.2d 1091, we suspended an attorney who, among other forms of professional misconduct, aided a nonattorney in the unauthorized practice of law. Through a scheme similar to the one in this case, an agent of an

insurance company contacted clients and sold them living-trust documents. The agent obtained the client's signature on a service agreement, an asset-disclosure agreement, and a retainer for legal services. The agent and the client completed a financial workbook to list the client's financial circumstances and distribution directives. The agent then collected a check, payable to the attorney, who deducted his legal fee and split the remaining amount between the insurance company for financial consultation and another, related company that prepared the documents.

{¶ 68} The attorney then telephoned the client to explain his role in the transaction and the distribution of the client's payment. After this conversation, the attorney directed the document-preparation company to prepare the documents. This company then sent the finished documents to the insurance company, which delivered them to the client and assisted in their signing. The attorney received only a summary of any changes made to the trust document; he did not receive the completed trust document.

{¶ 69} We observed that the attorney entered the relationship with the client, to whom he must render careful, independent advice, too late, since "the nonattorney ha[d] already given legal advice to the client regarding the client's legal matters, ha[d] gathered important information, and ha[d] recommended and sold a trust instrument." *Kathman*, 92 Ohio St.3d at 97, 748 N.E.2d 1091, citing *In re Mid-Am. Living Trust Assoc., Inc.* (Mo.1996), 927 S.W.2d 855, 867. We further observed that the attorney did little more than advise clients that he was entitled to a fee and then direct nonattorneys to draft the living-trust documents. He "did not see the final trust documents, did not execute the documents with the client, and certainly did not render the type of advice or counsel that a lawyer is ethically bound to render." Id. at 98.

{¶ 70} Except for the ruse of selling a prepaid legal plan, the operation in *Cleveland Bar Assn. v. Sharp Estate Servs., Inc.,* 107 Ohio St.3d 219, 2005-Ohio-

6267, 837 N.E.2d 1183, was remarkably close to American Family's scheme. Estate-planning companies developed prospects using telemarketers and purchased lists. Sharp's advisors made sales calls in the prospect's home to sell the prospect a living-trust plan or other estate plan, often without regard to whether the prospect would benefit from such estate planning. When a prospect purchased a trust or plan, the advisor had the prospect sign a purchase agreement and obtained two checks from the customer. The advisor received one check, and a review attorney, whom the advisor had selected, received the other check. The advisors were not attorneys.

{¶ 71} The review attorney entered the customer's information into a computer-software program provided by the corporation that had set up the network of advisors. The attorney did so usually without having had any contact with the customer. The corporation prepared the requested documents and returned them directly to the advisor, who delivered them to the customer.

{¶ 72} We held that this was the unauthorized practice of law because nonattorneys rendered legal services for others without the necessary oversight by a licensed practitioner in accordance with ethical standards. We rejected the argument that the use of the review attorneys to supervise this activity immunized the advisors from culpability for the unauthorized practice of law. We observed that the review attorneys only tangentially involved themselves in the transactions because they did nothing more than enter information into a computer program, typically without contacting the customers. Moreover, the review attorney did not approve the purchase agreement. Id. at ¶ 9.

{¶ 73} Here, American Family's sales agents, in the guise of selling prepaid legal plans, advised prospects on the benefits of its estate-planning tools. After signing up the prospect, the agents obtained sensitive financial information from the customer and delivered the agreement and the information to the Ohio office. The resident attorney (a virtual captive of American Family) sent a letter

to the customer and the customer's information to the California home office for document preparation. The resident attorney rarely, if ever, communicated with the customer; if he did, he communicated by telephone.

{¶ 74} The California office prepared the documents and returned them to the Ohio office for delivery to the customers. The resident attorney spent little time reviewing the documents. Without any personal contact with the customer, the attorney could not possibly have given the customer the individualized legal advice that it was his professional and ethical duty to give. He could not determine whether the estate-planning products suited the customers, and he could not determine whether the customer was competent to enter into the estate-planning arrangements.

{¶ 75} The attorney left it to Heritage's insurance agents to explain the documents as they secured the signatures of the customers. These agents had no incentive to deliver the documents other than to solicit additional insurance business from the customer, which provided the agent with the only compensation he would receive in the transaction. The agent's objective was to obtain the signatures through whatever means he could, including pressure tactics, so he could then sell annuities.

{¶ 76} All of the foregoing establishes by a preponderance of the evidence that respondents engaged in the unauthorized practice of law. And it is no defense, as some respondents claim, that they (1) disclosed to customers that the layperson was not an attorney and could not give legal advice or (2) obtained powers of attorney executed by the customers. *Cincinnati Bar Assn. v. Telford* (1999), 85 Ohio St.3d 111, 113, 707 N.E.2d 462, citing *Akron Bar Assn. v. Miller* (1997), 80 Ohio St.3d 6, 8-9, 684 N.E.2d 288, and *Richland Cty. Bar Assn. v. Clapp* (1998), 84 Ohio St.3d 276, 278, 703 N.E.2d 771.

{¶ 77} Moreover, American Family and Heritage agents in particular had to have a clear understanding of their excesses. A corporate predecessor,

20

American Heritage Corporation, saw its then resident attorney suspended from the practice of law for one year. *Columbus Bar Assn. v. Fishman*, 98 Ohio St.3d 172, 2002-Ohio-7086, 781 N.E.2d 204. Again, except for the ruse of the prepaid legal plan, American Heritage operated in the very same manner as American Family and Heritage did here. According to the decision, Fishman violated several disciplinary rules, including aiding a nonlawyer in the unauthorized practice of law. Fishman, as we pointed out, did not counsel clients concerning their best interests; he looked over the shoulders of nonattorneys who had already advised and secured agreements for the purchase of living trusts.

### III. Injunctive Relief and Civil Penalties

**{¶ 78}** We therefore accept the board's recommendation to enjoin respondents from further illegal acts constituting the unauthorized practice of law. We also accept the board's recommendation to impose monetary penalties under Gov.Bar R. VII(8)(B), which allows the board to recommend and the court to impose civil penalties in an amount up to $10,000 per offense. And because of the breadth of respondents' illicit enterprise, which CBA insists has continued in operation under at least one other corporate reincarnation, we increase the recommended monetary penalties in accordance with the formula advocated by the CBA.

**{¶ 79}** In reaching this conclusion, we have weighed the aggravating and mitigating factors listed in Gov.Bar R. VII(8)(B) and the supplementary provisions of UPL Reg. 400(F) that are present in this case. The factors to be considered under Gov.Bar R. VII(8)(B)(1) through (5) are the degree of cooperation by the respondents in the investigation, the number of UPL violations, the flagrancy of the violations, harm to third parties arising from the violations, and any other relevant factors. Under UPL Reg. 400(F), the "other relevant factors" include the following:

**{¶ 80}** "(1) Whether relator has sought imposition of a civil penalty and, if so, the amount sought.

**{¶ 81}** "(2) Whether the imposition of civil penalties would further the purposes of Gov.Bar R. VII.

**{¶ 82}** "(3) Aggravation. The following factors may be considered in favor of recommending a more severe penalty:

**{¶ 83}** "(a) Whether respondent has previously engaged in the unauthorized practice of law;

**{¶ 84}** "(b) Whether respondent has previously been ordered to cease engaging in the unauthorized practice of law;

**{¶ 85}** "(c) Whether the respondent had been informed prior to engaging in the unauthorized practice of law that the conduct at issue may constitute an act of the unauthorized practice of law;

**{¶ 86}** "(d) Whether respondent has benefited from the unauthorized practice of law and, if so, the extent of any such benefit;

**{¶ 87}** "(e) Whether respondent's unauthorized practice of law included an appearance before a court or other tribunal;

**{¶ 88}** "(f) Whether respondent's unauthorized practice of law included the preparation of a legal instrument for filing with a court or other governmental entity; and

**{¶ 89}** "(g) Whether the respondent has held himself or herself out as being admitted to practice law in the State of Ohio, or whether respondent has allowed others to mistakenly believe that he or she was admitted to practice law in the State of Ohio.

**{¶ 90}** "(4) Mitigation. The following factors may be considered in favor of recommending no penalty or a less severe penalty:

**{¶ 91}** "(a) Whether respondent has ceased engaging in the conduct under review;

{¶ 92} "(b) Whether respondent has admitted or stipulated to the conduct under review;

{¶ 93} "(c) Whether respondent has admitted or stipulated that the conduct under review constitutes the unauthorized practice of law;

{¶ 94} "(d) Whether respondent has agreed or stipulated to the imposition of an injunction against future unauthorized practice of law;

{¶ 95} "(e) Whether respondent's conduct resulted from a motive other than dishonesty or personal benefit;

{¶ 96} "(f) Whether respondent has engaged in a timely good faith effort to make restitution or to rectify the consequences of the unauthorized practice of law; and

{¶ 97} "(g) Whether respondent has had other penalties imposed for the conduct at issue."

{¶ 98} We find that there are no mitigating factors and that the following factors weigh in favor of a civil penalty:

{¶ 99} ● *The number of, flagrancy of, and received benefits from the violations.* From March 2003 to May 2005, respondents, at the direction of American Family, Heritage, and the Normans, collectively marketed trust plans at least 3,826 times by in-home sales visits, constituting at least that many breaches of the consent agreement. Under *Sharp Estate Servs.*, 107 Ohio St.3d 219, 2005-Ohio-6267, 837 N.E.2d 1183, each of these acts constitutes an incident of the unauthorized practice of law. And as relator asserts, the number of violations may be even higher because American Family pleadings and correspondence acknowledge about 8,000 plan members in Ohio.

{¶ 100} Moreover, the consent agreement, entered into by all respondents at a time when they were represented by counsel, provided ample notice of the illegality of the American Family/Heritage business model, and our decisions in

*Fishman* and *Kathman* established that the use of a plan attorney was no cure. *Sharp Estate Servs.*, id. at ¶ 9 and 10.

{¶ 101} ● *The potential and actual harm to third parties.* We have warned of the inherent harm posed to customers of enterprises operating as trust mills. *Sharp Estate Servs.*, 107 Ohio St.3d 219, 2005-Ohio-6267, 837 N.E.2d 1183, ¶ 15. And as relator points out, these risks have manifested themselves in customers having to pursue refunds for unnecessary or inappropriate instruments sold by respondents, to correct the problems these sales created, or both.

{¶ 102} ● *Deterrence of unauthorized practice of law and relator's request for the imposition of civil penalties.* Indeed, the conclusions reached in *Sharp Estate Servs.*, 107 Ohio St.3d 219, 2005-Ohio-6267, 837 N.E.2d 1183, ¶ 15, apply with equal force here:

{¶ 103} "[T]he respondents committed hundreds of [unauthorized-practice-of-law] violations. * * * [T]he respondents' violations were flagrant because they aggressively targeted customers even after *Kathman,* 92 Ohio St.3d 92, 748 N.E.2d 1091, which warned that trust-mill operations are [unauthorized-practice-of-law] violations. Finally, the respondents' offenses harmed third parties, their ostensible clients. As we stated in *Kathman,* 'The principal reason courts have restricted the rendering of legal services to licensed attorneys is for the protection of the public.' Id. at 97, 748 N.E.2d 1091. In short, the respondents have willfully defrauded their customers by selling trusts and estate documents without authorization."

{¶ 104} We permanently enjoin American Family Prepaid Legal Corporation, Heritage Marketing and Insurance Services, Inc., Jeffrey Norman, Stanley Norman, Paul Chiles, Harold Miller, Eric Peterson, Luther Mack Gordon, Chris Miller, Patty Soos, Anthony Sullivan, Jeff Alten, William Downs, Steve Grote, Jack Riblett, Ken Royer, Dennis Quilan, Alexander Scholp, Jerrold Smith,

Joseph Ehlinger, Paul Morrison, David Helbert, and Richard Rompala, as well as their successors, assigns, subsidiaries, and affiliates from any of the following:

{¶ 105} 1. Performing in Ohio any of the activities named in the March 2003 consent agreement, including (a) selling, marketing, or preparing wills, living trusts, durable powers of attorney, deed transfers, and agreements for transfer or assignment of personal property (collectively, "legal products"), (b) training, monitoring, and educating other sales representatives to sell, market, or prepare any of those legal products, (c) giving legal advice relative to those legal products, (d) advising and counseling clients concerning the suitability of those legal products for a client's particular situation, (e) gathering client information for purposes of preparing or determining the suitability of the appropriate legal products for a client's particular situation without acting under the direct supervision and control of the client's attorney, (f) preparing any of those legal products particularly for a client's situation without acting under the express direction and control of the client's attorney, (g) offering legal advice to any one concerning the execution of legal products, and (h) engaging the services of an Ohio attorney to conduct only cursory reviews of legal products with little or no contact with clients;

{¶ 106} 2. Offering or selling prepaid legal plans of any kind to Ohio residents and engaging in activities constituting the unauthorized practice of law in Ohio, including providing advice to consumers about estate plans, representing to consumers that they can provide living trusts or other estate plans either directly or through an attorney, representing to consumers that they can provide or arrange for the services of an attorney to prepare an estate plan, giving advice to consumers concerning disposition of assets, representing to consumers that they need a living trust as the sole or primary means of distributing their assets, and representing to consumers that living trusts are a better method for distributing estates than any other estate plan; and

**{¶ 107}** 3. Using, selling, leasing, giving, or in any way allowing any other person or entity to use the American Family and Heritage customer lists, which are defined as the names, addresses, telephone numbers, and any other personal identifying information that American Family and Heritage or their agents collected from Ohio consumers who purchased prepaid legal plans or legal documents from American Family or insurance products from Heritage.

**{¶ 108}** Next, we impose a civil penalty of $6,387,990, assessed jointly and severally, against American Family, Heritage, Jeffrey Norman, and Stanley Norman. We calculated this penalty by multiplying the number of persons who purchased living-trust documents as discovered by the CBA, 3,202, by the fee collected from each individual, $1,995.

**{¶ 109}** We further impose a $10,000 civil penalty against Paul Chiles and a $7,500 civil penalty against Harold Miller, both of whom orchestrated the entities' unauthorized practice of law in Ohio. We also impose a civil penalty of $2,500 against American Family sales agents Eric Peterson, Luther Mack Gordon, Chris Miller, Patty Soos, Anthony Sullivan, Jeff Alten, William Downs, Steve Grote, Jack Riblett, Ken Royer, Dennis Quilan, Alexander Scholp, Jerrold Smith, and Joseph Ehlinger, and a civil penalty of $2,500 against Heritage delivery agents Paul Morrison, David Helbert, and Richard Rompala.

**{¶ 110}** Finally, consistent with *Sharp Estate Servs.*, 107 Ohio St.3d 219, 2005-Ohio-6267, 837 N.E.2d 1183, and on the urging of amicus curiae, Ohio State Bar Association ("OSBA"), we order American Family, Heritage, Jeffrey Norman, and Stanley Norman to disclose the names of their Ohio customers. Within seven days following the issuance of the order of this court, these respondents shall disclose to the board, with a copy to CBA, the names and addresses of all of their Ohio clients. Beginning on the eighth day after the order, a fine of $25,000 per day will be imposed until all Ohio clients have been disclosed. CBA shall send a letter to each of the Ohio clients informing them of

the unauthorized practice of law by the respondents and suggesting that the clients may want to consult with a lawyer of their choice, at the clients' expense, to confirm that the respondents' documents are suitable and appropriate for them. These respondents shall also be responsible for costs in the amount recommended by the board.

{¶ 111} To permit the respondents' victims and victims of enterprises like the American Family/Heritage collaboration to pursue claims under R.C. 4705.07(C)(2) (providing a civil action to recover actual damages against any person whom this court has found to have engaged in the unauthorized practice of law), amicus curiae OSBA urges us to adopt this rule of law:

{¶ 112} "Where a person has committed multiple instances of the unauthorized practice of law involving the same conduct against different victims, a finding of the unauthorized practice of law for one victim is effective for all of the victims of the person for purposes of Ohio Revised Code § 4705.07(C)(2), and for all victims of such conduct by third persons."

{¶ 113} In our view, the availability of a cause of action under R.C. 4705.07(C)(2) necessarily follows from today's decision for those injured by respondents' acts and omissions that we have found to constitute the unauthorized practice of law. But as to victims of third parties against whom we have made no such findings, due process requires review of the individual facts and circumstances in those cases and precludes the sweeping statement that OSBA advocates.

## Part Two

{¶ 114} Pursuant to Gov.Bar R. VII(5b), the board has also recommended our approval of a consent decree proposed by relator, Columbus Bar Association ("CBA"), and respondents Joseph Hamel, Timothy Holmes, and Adam Hyers. The board treated the allegations against Hamel, Holmes, and Hyers separately from numerous other respondents charged in the underlying

complaints upon the filing of a proposed consent decree pursuant to Gov.Bar R. VII(5b) in partial resolution of the many claims that respondents had engaged in the unauthorized practice of law. The proposed consent decree consists of a written agreement entered into by the CBA and Hamel, Holmes, and Hyers on March 14, 2008.

{¶ 115} We accept the board's recommendation, approve the proposed consent decree in its entirety, and specifically order compliance with the terms setting forth the definitions, acts, and forbearances to which CBA and Hamel, Holmes, and Hyers agreed in their proposed resolution, which include the following:

{¶ 116} "1. The following words shall have the following meanings:

{¶ 117} "a. 'Individual Respondents' shall include Joseph Hamel, Timothy Holmes, and Adam Hyers.

{¶ 118} "b. 'Plan Member' shall include any Ohio consumer who purchased a prepaid legal plan membership or estate planning documents from:

{¶ 119} "i) Respondent AFPLC [American Family];

{¶ 120} "ii) Respondent AFPLC'S employees, agents and independent contractors;

{¶ 121} "iii) Respondent AFPLC's predecessors, successors and affiliates; or

{¶ 122} "iv) Attorney Andrew Fishman, deceased, his former employees, agents and independent contractors, including but not limited to Hamel, Holmes and Hyers.

{¶ 123} " 'Plan Member' shall also include clients of Attorney Andrew Fishman, deceased, whose files may have been transferred to another Plan Attorney or whose files are maintained by any successor, affiliate or related entities of Jeffrey Norman and/or Stanley Norman. Such entities include, but are not limited to, Quest Financial and Insurance Services; National Association of

Family Benefits, Inc.; Legal Maintenance Organization of America; National Estate Planning, Inc.; and National Group Services, Inc.

**{¶ 124}** "c. 'Plan Attorney' shall include any Ohio licensed attorney or law firm providing services to Ohioans who contracts or contracted to provide legal services in Ohio to any Plan Member through Respondents AFPLC and/or Heritage including, but not limited to, Edward Brueggeman, Cynthia Irwin, James Popil, John Donahue and Stephen Ramadan;

**{¶ 125}** "d. 'Estate planning documents' shall include trusts, living trusts, wills, pour over wills, advance health directives (e.g., living wills), powers-of-attorney, whether durable or springing, health care powers-of-attorney, asset transfer documents of any kind if used with the intent to plan an estate, certificates of trust and the like; and

**{¶ 126}** "e. 'Plan Members' family member' shall be limited to the spouse and children of the Plan Member.

**{¶ 127}** "2. Individual Respondents shall not engage in the unauthorized practice of law by providing legal advice to any Ohio resident.

**{¶ 128}** "3. Individual Respondents shall not market, offer or sell prepaid legal service plan memberships, or any other similar service or arrangement, estate planning documents or other legal documents in the State of Ohio.

**{¶ 129}** "4. Individual Respondents may carry out their contractual obligations with respect to existing Plan Members upon the Plan Members' request, only. Individual Respondents shall not initiate any contact with any Plan Member or the Plan Members' family member for the purpose of marketing, offering or selling insurance products and/or annuities. If contacted by a Plan member, Individual Respondents shall not provide legal advice or engage in conduct prohibited in Paragraphs 5, 6 and 7 herein.

**{¶ 130}** "5. Individual Respondents shall not knowingly market, offer or sell life insurance products and/or annuities to any:

{¶ 131} "(a) Plan Member;

{¶ 132} "(b) Plan Members' family member;

{¶ 133} "(c) Former and current clients or customers of Respondents AFPLC, Heritage, Jeffrey Norman or Stanley Norman and these Respondents' successors, affiliates or related entities;

{¶ 134} "(d) Former and current clients or customers of any other Respondent who acquired said clients through affiliation or employment with Respondents AFPLC or Heritage;

{¶ 135} "(e) Former and current clients or customers of any sales agent, insurance agent, delivery agent or employee of Respondents AFPLC or Heritage who acquired said clients through affiliation or employment with Respondents AFPLC or Heritage;

{¶ 136} "(f) Former and current clients or customers of Edward Brueggeman, Andrew Fishman, deceased, or any other Plan Attorney who acquired said clients through affiliation or employment with Respondents AFPLC or Heritage; or

{¶ 137} "(g) Former and current clients or customers of any entity owned, operated, managed, controlled by or affiliated with Jeffrey Norman, Stanley Norman, Michelle Norman, Mildred Glickman, Rebecca Klein, any Respondent or any Plan Attorney who acquired said clients through affiliation or employment with Respondents AFPLC or Heritage. Such entities include, but are not limited to, Quest Financial and Insurance Services; National Association of Family Benefits, Inc.; Legal Maintenance Organization of America; National Estate Planning, Inc.; and National Group Services, Inc.

{¶ 138} "6. Individual Respondents shall not explain to an Ohio citizen the terms and effects of trust documents or give any legal advice whatsoever regarding the same.

**{¶ 139}** "7. Individual Respondents shall not engage in any activity or conduct that furthers the business operations and activities of Respondents AFPLC, Heritage, Jeffrey Norman, Stanley Norman, any other Respondent, or any Plan Attorney. In addition, Individual Respondents shall not engage in any activity or conduct that furthers the business operations and activities of any entity that is owned, operated, managed, controlled by or affiliated with Jeffrey Norman, Stanley Norman, Michelle Norman, Mildred Glickman, Rebecca Klein, any other Respondent, or any Plan Attorney. Such entities include but are not limited to, Quest Financial and Insurance Services; National Association of Family Benefits, Inc.; Legal Maintenance Organization of America; National Estate Planning, Inc.; and National Group Services, Inc.

**{¶ 140}** "8. It is the intent of the parties that this Consent Decree ('2008 Consent Decree') resolve all currently existing claims between them, including those specified in the Pleadings of UPL 02-10, UPL 05-02 and all other alleged UPL violations for conduct which occurred up to and including the effective date of the 2008 Consent Decree.

**{¶ 141}** "9. Individual Respondents agree that as a result of the CBA's claims against them in Case No. UPL 02-10 and Case No. UPL 05-02, and all alleged UPL violations to date, they will each pay $2,500.00 to the Supreme Court of Ohio, to be paid on or before December 31, 2008.

**{¶ 142}** "10. This Consent Decree ('2008 Consent Decree') shall be a Consent Decree within the meaning of Rule VII of the Supreme Court of Ohio Rules for the Government of the Bar.

**{¶ 143}** "11. Individual Respondents agree to a liquidated damages provision in the 2008 Consent Decree. Respondents shall pay the Supreme Court of Ohio an additional $1,000.00 for *each* instance of breach of *any* of the provisions contained in the 2008 Consent Decree. Any liquidated damages

payable hereunder shall be in addition to any restitution for any such breach of the 2008 Consent Agreement as the Court may order.

**{¶ 144}** "12. Individual Respondents agree that their financial obligations in the 2008 Consent Decree ($2,500.00 plus any liquidated damages) are non-dischargeable in bankruptcy.

**{¶ 145}** "13. The Supreme Court of Ohio and the Board of Commissioners on the Unauthorized Practice of Law shall retain jurisdiction over the Individual Respondents for the purposes of enforcing any of the provisions of the 2008 Consent Decree. The 2008 Consent Decree is the final judgment of the Supreme Court of Ohio and is enforceable through contempt proceedings before the Court.

**{¶ 146}** "14. Individual Respondents are subject to the long-arm jurisdiction of Ohio Courts pursuant to Ohio Revised Code §2307.382.

**{¶ 147}** "15. Each Individual Respondent will be dismissed with prejudice from the UPL cases (UPL 02-10 and UPL 05-02) when his financial obligations set forth in Paragraph 9 are satisfied under the 2008 Consent Decree.

**{¶ 148}** "16. Nothing contained in the 2008 Consent Decree shall be construed as an admission of liability by Individual Respondents.

**{¶ 149}** "17. CBA and Individual Respondents each represent and warrant that they have the full power and authority to enter into the 2008 Consent Decree and to perform all the obligations and duties set forth herein. Each signatory to the 2008 Consent Decree who signs on behalf of a party represents that he or she has the authority to sign on behalf of that party.

**{¶ 150}** "18. CBA and Individual Respondents are each represented by counsel with respect to this Consent Decree and all matters covered by it, and each has been fully advised by said counsel regarding their rights and obligations with respect to the execution of the 2008 Consent Decree. CBA and Individual Respondents each authorize and direct their respective attorneys to execute such

papers and to take such other action as is necessary and appropriate to effectuate the terms of the 2008 Consent Decree.

{¶ 151} "19. The 2008 Consent Decree may be executed in any number of counterparts and each such counterpart shall for all purposes be deemed an original.

{¶ 152} "20. The laws of the State of Ohio shall govern the enforcement of the 2008 Consent Decree." (Emphasis sic.)

{¶ 153} In accordance with the board's recommendation, respondents are each given 90 days from the date of this order to deposit the civil penalty of $2,500 with the clerk of this court.

### Part Three

{¶ 154} Pursuant to Gov.Bar R. VII(5b), the board has also recommended our approval of a consent decree proposed by relator, Columbus Bar Association ("CBA"), and respondent Timothy Clouse. The board treated the allegations against Clouse separately from numerous other respondents charged in the underlying complaints upon the filing of a proposed consent decree pursuant to Gov.Bar R. VII(5b) in partial resolution of the many claims that respondents had engaged in the unauthorized practice of law. The proposed consent decree consists of a written agreement entered into by the CBA and Clouse on March 17, 2008.

{¶ 155} We accept the board's recommendation, approve the proposed consent decree in its entirety, and specifically order compliance with the terms setting forth the definitions, acts, and forbearances to which CBA and Clouse agreed, which include the following:

{¶ 156} "1. The following words shall have the following meanings:

{¶ 157} "a. 'Individual Respondent' shall include Timothy Clouse.

{¶ 158} "b. 'Plan Member' shall include any Ohio consumer who purchased a prepaid legal plan membership or estate planning documents from:

{¶ 159} "i) Respondent AFPLC [American Family];

{¶ 160} "ii) Respondent AFPLC's employees, agents and independent contractors;

{¶ 161} "iii) Respondent AFPLC's predecessors, successors and affiliates; or

{¶ 162} "iv) Attorney Andrew Fishman, deceased, his former employees, agents and independent contractors, including but not limited to Hamel, Holmes and Hyers [sic; "Clouse"?].

{¶ 163} " 'Plan Member' shall also include clients of Attorney Andrew Fishman, deceased, whose files may have been transferred to another Plan Attorney or whose files are maintained by any successor, affiliate or related entities of Jeffrey Norman and/or Stanley Norman. Such entities include, but are not limited to, Quest Financial and Insurance Services; National Association of Family Benefits, Inc.; Legal Maintenance Organization of America; National Estate Planning, Inc.; and National Group Services, Inc.

{¶ 164} "c. 'Plan Attorney' shall include any Ohio licensed attorney or law firm providing services to Ohioans who contracts or contracted to provide legal services in Ohio to any Plan Member through Respondents AFPLC and/or Heritage including, but not limited to, Edward Brueggeman, Cynthia Irwin, James Popil, John Donahue and Stephen Ramadan;

{¶ 165} "d. 'Estate planning documents' shall include, trusts, living trusts, wills, pour over wills, advance health directives (e.g., living wills), powers-of-attorney, whether durable or springing, health care powers-of-attorney, asset transfer documents of any kind if used with the intent to plan an estate, certificates of trust and the like; and

{¶ 166} "e. 'Plan Members' family member' shall be limited to the spouse and children of the Plan Member.

**{¶ 167}** "2. Individual Respondent shall not engage in the unauthorized practice of law by providing legal advice to any Ohio resident.

**{¶ 168}** "3. Individual Respondent shall not market, offer or sell prepaid legal service plan memberships, or any other similar service or arrangement, estate planning documents or other legal documents in the State of Ohio.

**{¶ 169}** "4. Individual Respondent may carry out his contractual obligations with respect to existing Plan Members upon the Plan Members' request, only. Individual Respondent shall not initiate any contact with any Plan Member or the Plan Members' family member for the purpose of marketing, offering or selling prepaid legal plans, estate planning services, insurance products and/or annuities. If contacted by a Plan member, Individual Respondent shall not provide legal advice or engage in conduct prohibited in Paragraphs 5, 6 and 7 herein.

**{¶ 170}** "5. Individual Respondent shall not knowingly market, offer or sell life insurance products and/or annuities to any:

**{¶ 171}** "(a) Plan Member;

**{¶ 172}** "(b) Plan Members' family member;

**{¶ 173}** "(c) Former and current clients or customers of Respondents AFPLC, Heritage, Jeffrey Norman or Stanley Norman and these Respondents' successors, affiliates or related entities;

**{¶ 174}** "(d) Former and current clients or customers of any other Respondent who acquired said clients through affiliation or employment with Respondents AFPLC or Heritage;

**{¶ 175}** "(e) Former and current clients or customers of any sales agent, insurance agent, delivery agent or employee of Respondents AFPLC or Heritage who acquired said clients through affiliation or employment with Respondents AFPLC or Heritage;

**{¶ 176}** "(f) Former and current clients or customers of Edward Brueggeman, Andrew Fishman, deceased, or any other Plan Attorney who acquired said clients through affiliation or employment with Respondents AFPLC or Heritage; or

**{¶ 177}** "(g) Former and current clients or customers of any entity owned, operated, managed, controlled by or affiliated with Jeffrey Norman, Stanley Norman, Michelle Norman, Mildred Glickman, Rebecca Klein, any Respondent or any Plan Attorney who acquired said clients through affiliation or employment with Respondents AFPLC or Heritage. Such entities include, but are not limited to, Quest Financial and Insurance Services; National Association of Family Benefits, Inc.; Legal Maintenance Organization of America; National Estate Planning, Inc.; and National Group Services, Inc.

**{¶ 178}** "6. Individual Respondent shall not explain to an Ohio citizen the terms and effects of trust documents or give any legal advice whatsoever regarding the same.

**{¶ 179}** "7. Individual Respondent shall not engage in any activity or conduct that furthers the business operations and activities of Respondents AFPLC, Heritage, Jeffrey Norman, Stanley Norman, any other Respondent, or any Plan Attorney. In addition, Individual Respondent shall not engage in any activity or conduct that furthers the business operations and activities of any entity that is owned, operated, managed, controlled by or affiliated with Jeffrey Norman, Stanley Norman, Michelle Norman, Mildred Glickman, Rebecca Klein, any other Respondent, or any Plan Attorney. Such entities include but are not limited to, Quest Financial and Insurance Services; National Association of Family Benefits, Inc.; Legal Maintenance Organization of America; National Estate Planning, Inc.; and National Group Services, Inc.

**{¶ 180}** "8. It is the intent of the parties that this Consent Decree ('2008 Consent Decree') resolve all currently existing claims between them, including

those specified in the Pleadings of UPL 02-10, UPL 05-02 and all other alleged UPL violations for conduct which occurred up to and including the effective date of the 2008 Consent Decree.

{¶ 181} "9. Individual Respondent agrees that as a result of the CBA's claims against him in Case No. UPL 02-10 and Case No. UPL 05-02, and all alleged UPL violations to date, he will pay $2,500.00 to the Supreme Court of Ohio, to be paid on or before December 31, 2008.

{¶ 182} "10. This Consent Decree ('2008 Consent Decree') shall be a Consent Decree within the meaning of Rule VII of the Supreme Court of Ohio Rules for the Government of the Bar.

{¶ 183} "11. Individual Respondent agrees to a liquidated damages provision in the 2008 Consent Decree. Individual Respondent shall pay the Supreme Court of Ohio an additional $1,000.00 for *each* instance of breach of *any* of the provisions contained in the 2008 Consent Decree. Any liquidated damages payable hereunder shall be in addition to any restitution for any such breach of the 2008 Consent Agreement as the Court may order.

{¶ 184} "12. Individual Respondent agrees that his financial obligations in the 2008 Consent Decree ($2,500.00 plus any liquidated damages) are non-dischargeable in bankruptcy.

{¶ 185} "13. The Supreme Court of Ohio and the Board of Commissioners on the Unauthorized Practice of Law shall retain jurisdiction over the Individual Respondent for the purposes of enforcing any of the provisions of the 2008 Consent Decree. The 2008 Consent Decree is the final judgment of the Supreme Court of Ohio and is enforceable through contempt proceedings before the Court.

{¶ 186} "14. Individual Respondent is subject to the long-arm jurisdiction of Ohio Courts pursuant to Ohio Revised Code §2307.382.

**{¶ 187}** "15. Individual Respondent will be dismissed with prejudice from the UPL cases (UPL 02-10 and UPL 05-02) when his financial obligations set forth in Paragraph 9 are satisfied under the 2008 Consent Decree.

**{¶ 188}** "16. Nothing contained the 2008 Consent Decree shall be construed as an admission of liability by Individual Respondent.

**{¶ 189}** "17. CBA and Individual Respondent each represent and warrant that they have the full power and authority to enter into the 2008 Consent Decree and to perform all the obligations and duties set forth herein. Each signatory to the 2008 Consent Decree who signs on behalf of a party represents that he or she has the authority to sign on behalf of that party.

**{¶ 190}** "18. The 2008 Consent Decree may be executed in any number of counterparts and each such counterpart shall for all purposes be deemed an original.

**{¶ 191}** "19. The laws of the State of Ohio shall govern the enforcement of the 2008 Consent Decree." (Emphasis sic.)

**{¶ 192}** In accordance with the board's recommendation, respondent is given 90 days from the date of this order to deposit the civil penalty of $2,500 with the clerk of this court.

### Conclusion

**{¶ 193}** For the reasons stated, we adopt the recommendations of the board, with the exception that we dismiss Vern Schmid and Samuel Jackson and we sustain the objections of relator Columbus Bar Association to the board's recommended sanction as explained in Part One of this opinion. Costs are taxed, jointly and severally, to the respondents enjoined in Part One.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

_____

Porter, Wright, Morris & Arthur, L.L.P., Joyce D. Edelman, Aaron M. Shank, and J.H. Huebert, for relator.

Reinheimer & Reinheimer, Andrew S. Bucher, and James L. Reinheimer, for respondents American Family Prepaid Legal Corporation, Heritage Marketing Insurance and Services, Inc., and Jeffrey Norman.

Eric Peterson, pro se.

Stephen Grote, pro se.

Alexander Scholp, pro se.

William F. Downs, pro se.

Moore & Scribner and Christopher J. Moore, for respondents Joseph Hamel and Timothy Holmes.

Tyack, Blackmore & Liston Co., L.P.A., and James P. Tyack, for respondent Adam Hyers.

Timothy Clouse, pro se.

Shumaker, Loop & McKendrick, L.L.P., and John N. MacKay; and Eugene P. Whetzel, Bar Counsel, for amicus curiae, Ohio State Bar Association.

_____